# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL ANGEL MORALES,<br><br>        Plaintiff,<br><br>    v.<br><br>GOVERNOR EDMUND G. BROWN, JR., et al.,<br><br>        Defendants. | Case No.  1:14-cv-01717-LJO-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING DEFENDANTS' MOTION TO DISMISS<br><br>(ECF No. 26, 37, 40)<br><br>OBJECTIONS DUE WITHIN FOURTEEN DAYS |

Plaintiff Miguel Angel Morales filed this civil rights action pursuant to 42 U.S.C. § 1983 and the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350.  Currently before the Court is Defendants' motion to dismiss filed on June 15, 2015.  (ECF No. 26.)

Oral argument on the motion was held on October 16, 2015.  Counsel Brian Bush appeared telephonically for Plaintiff and counsel Jon Allin appeared telephonically for Defendants.  Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the October 16, 2015 hearing, as well as the Court's file, the Court issues the following findings and recommendations recommending granting Defendants' motion to dismiss.

/ / /

/ / /

# I.

## PROCEDURAL HISTORY

On November 1, 2014, Plaintiff filed this action against Defendants Governor Jerry Brown, Jr.; former Governor Arnold Schwarzenegger; Secretary of the CDCR Jeffrey Beard; former Secretary of the CDCR Matthew Cate; Warden of KVSP Martin Biter; and former Warden of KVSP Anthony Hedgpeth.  (ECF No. 1.)  Defendants filed a motion to dismiss which was denied as moot after the parties stipulated to allow Plaintiff to file an amended complaint.  (ECF Nos. 20, 24.)  Plaintiff filed a first amended complaint on May 15, 2015.  (ECF No. 25.)  Defendants filed a second motion to dismiss the first amended complaint on June 15, 2015.  (ECF No. 26.)  On July 14, 2015, this motion was stayed pending resolution of outstanding motions in a related case, Jackson v. State of California, 1:13-cv-01055-LJO-SAB.   On September 18, 2015, District Judge Lawrence J. O'Neill issued an order addressing the motion in Jackson, and the stay of the motion to dismiss in this action was lifted.  (ECF No. 31.)  On October 7, 2015, Plaintiff filed an opposition to Defendant's motion to dismiss.  (ECF No. 37.)  On October 14, 2014, Defendants filed a reply.  (ECF No. 40.)

# II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true.  Iqbal, 556 U.S. at 678-79.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.

In deciding whether a complaint states a claim, the Ninth Circuit has found that two

1  principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint
2  "may not simply recite the elements of a cause of action, but must contain sufficient allegations
3  of underlying facts to give fair notice and to enable the opposing party to defend itself
4  effectively."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair
5  to require the defendant to be subjected to the expenses associated with discovery and continued
6  litigation, the factual allegations of the complaint, which are taken as true, must plausibly
7  suggest an entitlement to relief.  Starr, 652 F.3d at 1216.

8  **III.**

9  **COMPLAINT ALLEGATIONS**

10  Plaintiff is a twenty-seven year old Hispanic male who is a citizen of Mexico.  (Id. at 22.)
11  Plaintiff was ordered committed to the custody of the California Department of Corrections and
12  Rehabilitation ("CDCR") on March 22, 2008, and was in generally good health.  (Id. at ¶ 1, 23.)
13  Plaintiff was housed at Kern Valley State Prison ("KVSP") where Valley Fever is endemic.  (Id.
14  at ¶ 2.)

15  Plaintiff became ill and was hospitalized on October 12, 2010.  (Id. at ¶ 24.)  Plaintiff was
16  diagnosed with Valley Fever in the beginning of November 2010.  (Id.)  In August 2011,
17  Plaintiff was diagnosed with cocci meningitis, the most lethal form of Valley Fever.  (Id. at ¶
18  25.)  The fluid had accumulated around Plaintiff's brain and he developed obstructive
19  hydrocephalus.  (Id.)  A shunt was surgically inserted through Plaintiff's stomach and into his
20  brain to drain the fluid from his brain.  (Id.)  Plaintiff suffered renal failure from the medications
21  he was taking to control the spread of the disease.  (Id.)  Plaintiff was hospitalized for over six
22  months with chronic infection of the tissues surrounding his brain and spinal cord before being
23  transferred back to KVSP.  (Id. at ¶¶ 3, 26.)  Plaintiff had metal shunts inserted into his brain to
24  keep fluid from accumulating in the lining of his brain due to the infection.  (Id.)  There is no
25  cure for Valley Fever and Plaintiff will need medical treatment, including metal shunts in his
26  brain, for the remainder of his life.  (Id. at ¶ 3.)

27  Plaintiff was released on parole in March 2014.  (Id. at ¶ 40.)  About May 25, 2014,
28  Plaintiff collapsed at home and was taken to the hospital.  (Id. at ¶27.)  The doctors discovered

that the shunt had malfunctioned and a second surgical procedure was done to insert a new shunt. (Id.)  Plaintiff was deported to Mexico on March 19, 2015.  (Id. at ¶ 28.)  Since Plaintiff was deported he is unable to see doctors in the United States and does not have access to the medications he was taking and the treatments he was receiving in the United States.  (Id.)

Plaintiff brings this action against Governor Jerry Brown, Jr.; former Governor Arnold Schwarzenegger; Secretary of the CDCR Jeffrey Beard; former Secretary of the CDCR Matthew Cate; Warden of KVSP Martin Biter; and former Warden of KVSP Anthony Hedgpeth.

Plaintiff alleges that Valley Fever is a serious infectious disease which is contracted by inhalation of an airborne fungus and it is prevalent in the San Joaquin Valley of California.  (Id. at ¶ 48.)  Once the fungal spores are inhaled and lodge in the respiratory system, they grow and transform into large tissue invasive parasitic spherules which spread and invade surrounding tissue or migrate through the blood to other tissue or organs.  (Id.)  The majority of individuals infected with Valley Fever have minor symptoms that resolve by themselves within weeks, but approximately five percent of individual's infections disseminate and cause infections, skin disease, abscesses and meningitis.  (Id. at ¶¶ 50-51.)  There is no cure for Valley Fever.  (Id. at ¶ 52.)  The disease is treated with medication to control the symptoms.  (Id. at ¶ 53.)

California health officials have known of the prevalence of Valley Fever in the San Joaquin Valley for over fifty years.  (Id. at ¶ 54.)  Epidemiological studies in the late 1930 suggested that there would be high infection rates among newcomers if large military or civilian installations were established in the Central Valley.  (Id. at ¶ 57.)  In the 1940s, the United States Military established four basic training fields in the San Joaquin Valley.  (Id. at ¶ 58.)  A study was conducted finding that the naturally occurring conditions of the training fields were alarmingly conducive to the spread of Valley Fever.  (Id. at ¶ 58.)  This study sparked a policy minimizing the use of military maneuvers in the endemic areas of the San Joaquin Valley.  (Id.)

In 1944 a work camp was built for German prisoners of war in the San Joaquin Valley. (Id. at ¶ 59.)  By 1945 there were more cases of Valley Fever among the prisoners of war than in the entire United States army and these prisoners were moved out of the San Joaquin Valley. (Id.)

1    In June of 1994, the U.S. Centers for Disease Control and Prevention ("CDC") published

2 an article reporting on the impact of Valley Fever in California and that 70% of the reported

3 cases in California arose in the San Joaquin Valley.  (Id. at ¶ 62.)  In September of 1996, an

4 article was published by two doctors from the University of California-San Diego, School of

5 Medicine, commenting on the Valley Fever epidemic of 1991-1993.  (Id. at ¶ 40.)

6    In 1996, the National Foundation for Infectious Diseases held an International

7 Conference on Coccidioidomycosis and published a summary of the articles discussed at the

8 conference.  Included in these articles was the "California Health Services Policy Statement on

9 Coccidioidomycosis," which stated that from 1991 to 1993, California was spending $60 million

10 in health care costs from Valley Fever infections.  (Id. at ¶ 61.)

11    In September of 1996, two University of California doctors published an article that

12 commented on the Valley Fever epidemic.  (Id. at ¶ 62.)  The article reported that the San

13 Joaquin Valley is one of the most highly coccidioidomycosis-endemic regions.  (Id.)

14    Despite this, the CDCR built eight prisons in the hyper-endemic regions of the San

15 Joaquin Valley.  (Id. at ¶ 63.)  Prison officials have failed to implement any remedial measures

16 recommended to reduce inmate exposure to Valley Fever.  (Id. at ¶ 64.)

17    In November 2004, a memorandum was distributed to all health care managers, staff

18 members, and other officials within CDCR discussing Valley Fever and its origins in soil fungus.

19 (Id. at ¶ 65.)  The memorandum discussed that clinical staff were to maintain a high level of

20 suspicion for the disease.  (Id. at ¶ 66.)  It discussed activities that could stir up the spores, the

21 risk of disseminated disease, and that the risk of disseminated disease was highest in American

22 Indians, Asians, Blacks, and immuno-compromised individuals.  (Id.)  This memo continues to

23 widely available to state officials.  (Id. at ¶ 67.)

24    An August 3, 2006 memorandum confirms that CDCR officials were aware that some

25 inmates were exposed to a higher risk of Valley Fever.  (Id. at ¶ 68.)  An October 27, 2006

26 CDCR memorandum to all administrative personnel documented the approximation of the

27 number of inmates with a positive Valley Fever lab result from 2001 through 2006 and the

28 number of inmate deaths.  (Id. at ¶¶ 69, 70.)

In January 2007, a study by the California Department of Public Health, reported that Asians, Hispanics, African-Americans, Filipinos, and American-Indians, as well as immuno-compromised and immune-suppressed individuals, are more likely to develop disseminated disease. (Id. at ¶¶ 78, 79.) The study recommended relocating these high risk groups outside the hyper-endemic areas and taking mitigation measures, including ventilation, respiratory protection, and dust suppression and dust control. (Id. at ¶ 80.)

An August 2007 article in the Prison Legal News reported that CDCR executives and officials had widespread knowledge of the substantial risk of harm to high risk groups from Valley Fever. (Id. at ¶ 81.)

A November 20, 2007 CDCR memorandum to institution staff identified the significant increase in Valley Fever cases, including the five deaths in 2005. (Id. at ¶¶ 70, 71.) This memorandum included mitigation techniques that could be used including transferring inmates who met the cocci susceptibility exclusion criteria, planting ground cover or grass on open areas and the use of protective masks or wetting the soil when digging. (Id. at ¶ 72.)

In 2008, Governor Schwarzenegger issued an executive order declaring a statewide drought and strongly encouraged local water agencies and districts to take aggressive immediate action to reduce water consumption. (Id. at ¶ 89.) CDCR representatives interpreted the order as a directive to stop maintaining grass cover thereby increasing the risk that inmates at Kern Valley State Prison would be exposed to Valley Fever spores. (Id.)

Between September 2010 and December 2011, Defendant Cate supervised a comprehensive evaluation of the inmate classification system. (Id. at ¶ 102.) Defendant Cate did not include any consideration of the risk of inmate's contracting Valley Fever in the process of inmate classification. (Id. at ¶ 103.)

In April 2012, a report was released reporting that nothing done between 2006 and 2010 had any effect on the Valley Fever incident rates at prisons in the San Joaquin Valley. (Id.) From 2006 to 2013, 62 inmates died from as a result of expose to Valley Fever. (Id. at ¶ 76.) Plaintiff alleges that housing him in the San Joaquin Valley constituted deliberate indifference in violation of the Eighth Amendment; crimes against humanity and cruel, inhuman, and degrading

1  treatment, and torture in violation of 28 U.S.C. § 1350.  (Id. at pp. 20-29.)  Plaintiff is seeking
2  compensatory damages and injunctive relief.  (Id. at p. 29.)

3                                                   IV.

4                                          **DISCUSSION**

5          Defendants move to dismiss Plaintiff's first amended complaint on the grounds that 1)
6  the ATS does not support actions against domestic defendants and the claims are duplicative of
7  the Eighth Amendment claims; 2) housing Plaintiff at Kern Valley State Prison does not
8  constitute a crime against humanity or cruel, inhuman, and degrading treatment; 3) the
9  allegations in the complaint fail to state a claim under any legal theory; 4) Defendants are
10  entitled to qualified immunity; 5) Plaintiff's injunctive relief claims are barred by the Eleventh
11  Amendment; and 6) no Defendant in this action has the authority to alter Plaintiff's immigration
12  status or right to enter the United States.

13          **A.      Alien Tort Statute**

14          Plaintiff brings this action pursuant to 28 U.S.C. § 1350 which provides that the district
15  court has original jurisdiction over any civil action by an alien for a tort committed in violation
16  of the law of nations or a treaty of the United States.  The elements for a violation of the Alien
17  Tort Statute (ATS) are satisfied where 1) an alien sues 2) for a tort 3) committed in violation of
18  the law of nations.  Kadic v. Karadzic, 70 F.3d 232, 238 (2d Cir. 1995).  Initially, Defendants
19  move to dismiss Plaintiff's claims brought under the ATS on the ground that it does not provide
20  for a claim against a domestic actor.

21          The Alien Tort Statute was passed as part of the Judiciary Act of 1789.[1]  Kiobel v. Royal
22  Dutch Petroleum Co., 133 S.Ct 1659, 1663 (2013).  In enacting the ATS, the United States was
23  "embarrassed by its potential inability to provide judicial relief to foreign officials injured in the
24  United States."  Kiobel, 133 S.Ct at 1668.  Shortly before the Judiciary Act was passed, an
25  offense had been committed against an ambassador that violated the law of nations, "and if not
26  adequately redressed could rise to an issue of war."  Id. (quoting Sosa v. Alvarez-Machain, 542

27

28  _____
   [1]  Enacted on September 24, 1789, as part of the omnibus legislation establishing the federal judiciary.

1  U.S. 692, 715 (2004)). "The ATS ensured that the United States could provide a forum for
2  adjudicating such incidents." Kiobel, 133 S. Ct. at 1668.

3      After being enacted, the ATS was rarely invoked for two hundred years until the Second
4  Circuit in Filartiga v. Pena–Irala, 630 F.2d 876 (2d Cir.1980), construed the statute as allowing
5  two Paraguayan citizens to bring a civil action against a Paraguayan police officer who tortured
6  and killed their son. Doe I v. Nestle USA, Inc., 766 F.3d 1013, 1018 (9th Cir. 2014). The
7  Supreme Court has held that the ATS is a jurisdictional statute that was enacted to provide a
8  cause of action for a modest number of international violations with a potential for personal
9  liability at the time it was enacted. Sosa, 542 U.S. at 724. "Specifically, Sosa held that federal
10  common law creates tort liability for violations of international legal norms, and the ATS in turn
11  provides federal courts with jurisdiction to hear these hybrid common law—international law tort
12  claims." Doe I, 766 F.3d at 1018.

13      At the time that it was enacted, the ATS recognized three primary violations of
14  international law: "violation of safe conducts, infringement of the rights of ambassadors, and
15  piracy." Sosa, 542 U.S. at 692. "Under contemporary international law, federal courts have
16  permitted plaintiffs to pursue ATS claims based on a broad range of misconduct, including
17  genocide, war crimes, torture, and supporting terrorism." Doe I, 766 F.3d at 1019. Federal
18  courts are limited to only recognizing causes of action "for alleged violations of international law
19  norms that are 'specific, universal, and obligatory.' " Kiobel, 133 S.Ct at 1665. A plaintiff
20  meets this burden by showing a general recognition among states that a specific practice is
21  prohibited. Forti v. Suarez-Mason, 694 F.Supp.707, 709 (N.D. Cal. 1988).

22      In Sosa, the Supreme Court repeatedly directed courts to use judicial caution when
23  considering adding new causes of actions to the ATS. Kiobel, 133 S.Ct at 1664. In determining
24  whether to recognize a new cause of action the court must exercise "an element of judgment
25  about the practical consequences of making that cause available to litigants in federal court." Id.
26  at 732-33. The inquiry is to focus on "the consequences that might result from making the cause
27  of action generally available to all potential plaintiffs," and allows courts "to consider other
28  prudential concerns consistent with Sosa's approach." Id. (quoting Khulumani v. Barclay Nat'l

1  Bank Ltd., 504 F.3d 254, 268 (2d Cir.2007) (Katzmann, J., concurring)).

2      1.      Whether a Domestic Defendant Can Be Sued Under the ATS

3      Defendants rely on Lopez v. Richardson, 647 F.Supp.2d 1356 (N.D. Ga. 2009) to argue

4  that a claim cannot be brought by a domestic actor under the ATS.  In Lopez, an alien brought a

5  civil rights action under 42 U.S.C. § 1983 against the city and a city police officer for excessive

6  force in violation of the Fourth and Fourteenth Amendments.  647 F.Supp.2d at 1358-59.  The

7  Lopez court recognized that the ATS does not describe any category of defendants, but a related

8  statute, the Torture Victim Protection Act created a "cause of action for damages against '[a]n

9  individual who, under actual or apparent authority, or color of law, **of any foreign nation** ...

10  subjects an individual to torture.' "  Id. at 1363 (emphasis in original).  The court noted that since

11  the ATS was revived by Filartiga, no case has directly addressed whether a claim against a

12  domestic actor can be brought under the ATS; cases brought against domestic actors proceed

13  directly to a discussion of sovereign immunity or merits analysis.  Id.  The court then found that:

> While there is nothing in the language of the Alien Tort Statute that precludes its use against domestic U.S. actors, there are obvious reasons why allowing domestic actors to be held liable under the Alien Tort Statute would result in a significant change to the legal landscape. If courts were to recognize the applicability of § 1350 to domestic situations, then every encounter of an alien with a police officer will become not just a "federal case," but an "international case." This would require federal courts to not only determine whether a plaintiff's cause of action against police officers, to take one example, states a federal constitutional claim—a complicated exercise in itself—but also whether the actions state a claim under international law.

14
15
16
17
18
19  Id. at 1363-64.

20      The Lopez court considered that Sosa advised against overreaching under the ATS and

21  that the plaintiff's claims were cognizable under the Fourth Amendment.  Id. at 1365.  The court

22  held that domestic defendants were not appropriate defendants under the ATS.

23      In a dissenting opinion in Kiobel, four justices concurred that they would find jurisdiction

24  under the ATS "where (1) the alleged tort occurs on American soil, (2) the defendant is an

25  American national, or (3) the defendant's conduct substantially and adversely affects an

26  important American national interest, and that includes a distinct interest in preventing the

27  United States from becoming a safe harbor (free of civil as well as criminal liability) for a

28

torturer or other common enemy of mankind."  133 S. Ct. at 1671 (dissenting opinion).  The statute itself does not limit the citizenship of the defendant.  In re Estate of Ferdinand E. Marcos Human Rights Litigation, 978 F.2d 493, 500 (9th Cir. 1992).

> ("There is evidence ... that the intent of [the ATS] was to assure aliens access to federal courts to vindicate any incident which, if mishandled by a state court, might blossom into an international crisis.").  In other words, the ATS gave federal courts an appropriate supporting role in the sphere of foreign affairs: facilitating the political branches' conduct of foreign relations by averting potential international crises that could arise from disputes involving a nexus to the United States.  By providing a limited mechanism to vindicate the rights of aliens in these situations, the ATS authorized federal courts to assist the new nation in shouldering its responsibilities as a member of the international community.

Sarei v. Rio Tinto, PLC, 550 F.3d 822, 839 (9th Cir. 2008) (quoting Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 783 (D.C.Cir.1984) (Edwards, J., concurring).

In addressing the history of the statute, courts recognize two notorious incidents regarding the rights of foreign ambassadors that occurred relatively close in time to the statute being enacted.  Kiobel, 133 S.Ct. at 1666.  The first was a physical and verbal assault by a French adventurer on the Secretary of the French Legion in Philadelphia in 1784.  Id.  "The assault led the French Minister Plenipotentiary to lodge a formal protest with the Continental Congress and threaten to leave the country unless an adequate remedy were provided."  Id.

The second incident occurred in 1787 when a constable entered the Dutch Ambassador's residence and arrested one of his domestic servants.  Id.  At the request of the Secretary of Foreign Affairs the constable was arrested, but because no legislation had been passed respecting the breach of the privileges of Ambassadors, any relief was only available under common law.  Id. at 1666-67.

If domestic actors are excluded from the statute, an incident such as the 1787 offense against the ambassador by law enforcement could not be addressed in the federal court.  At the time that the Judiciary Act was being considered, the French Ambassador had lodged a protest with the Continental Congress and threatened to leave the country unless an adequate remedy was provided for the 1784 assault.  Kiobel, 133 S.Ct. at 1666.  Additionally, after the 1787 incident, the Mayor of New York City had cautioned that there was not an adequate remedy for

offenses against ambassadors except under common law because no legislation had been passed respecting a breach of the privileges of ambassadors.  Id.  When enacting the ATS, the legislature did not include any limitation regarding domestic actors nor is there any legislative history to indicate any such intent.  The Court finds that by including the ATS in the Judiciary Act of 1789, Congress provided federal jurisdiction over torts committed against aliens including those violations committed by a domestic actor.

While Defendants argue that recognizing that actions by domestic actors could violate the ATS would expand the statute, the ATS only applies to actions which violate the law of nations or a treaty of the United States.  In determining whether a domestic actor has violated the statute the reviewing court is required to consider the alleged conduct.  If Defendants are correct that actions against domestic actors cannot be brought under the statute, then the Court would have jurisdiction over an action where the conduct was taken by a nondomestic actor, but not have jurisdiction where a domestic actor exhibited the same conduct.  This is inconsistent with the purpose of the statute to provide a federal forum for violations of international law or treaties.  Accordingly, the Court finds that the ATS does not exclude acts by domestic actors.

While appreciating the concern expressed by the Lopez court, concerns regarding the overreach of the statute must be addressed by Congress and not by judicial limitation contrary to the express language of the statute.  Heppner v. Alyeska Pipeline Service Co., 665 F.2d 868, 872 (9th Cir. 1981) (distinguishing when the Court can correct absurdity in statute).

2.     Crimes Against Humanity

Plaintiff claims that housing him at Kern Valley Prison was a crime against humanity.  Plaintiff cites the Rome Statute which defines crimes against humanity as certain acts committed as part of a widespread or systematic attack directed against any civilian population with knowledge of the attack.  (ECF No. 25 at ¶ 157.)  Plaintiff alleges that housing African-American and Hispanic inmates in circumstances where they could contract Valley Fever is an inhumane act causing great suffering or serious injury to body or mental or physical health.  (Id. at ¶ 168.)

The Rome Statute provides the most current definition of a crime against humanity.  Doe

v. Rafael Saravia, 348 F. Supp. 2d 1112, 1155 (E.D. Cal. 2004).  A crime against humanity is defined "in part, as an act committed as part of a 'widespread or systematic' attack against a civilian population[,]" with knowledge of the attack.  Doe v. Qi, 349 F. Supp. 2d 1258, 1308 (N.D. Cal. 2004) (quoting I.C.C. Statute, art. 7, 37 I.L.M. 999, 1004 (1998)); Abagninin v. AMVAC Chemical Corp., 545 F.3d 733, 741 (9th Cir. 2008).  Article 7 of the Rome Statute defines crimes against humanity as a number of defined acts committed as part of a widespread systemic attach against a civil population with knowledge of the attack.[2] "An "attack directed against any civilian population' is a course of conduct 'pursuant to or in furtherance of a State or organizational policy to commit such attack.' " Abagninin, 545 F.3d at 741.  Widespread and systematic have been defined as:

> The concept "widespread" may be defined as massive, frequent, large scale action, carried out collectively with considerable seriousness and directed against a multiplicity of victims. The concept of "systematic" may be defined as thoroughly organized and following a regular pattern on the basis of a common policy involving substantial public or private resources. There is no requirement that this policy must be adopted formally as the policy of a state. There must, however, be some kind of preconceived plan or policy.

Qi, 349 F. Supp. 2d at 1308 (citations omitted).

"Crimes against humanity include murder, enslavement, deportation or forcible transfer, torture, rape or other inhumane acts committed as part of a widespread or systematic attack against a civilian population." In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder Derivative Litig. ("In re Chiquita"), 792 F. Supp. 2d 1301, 1334 (S.D. Fla. 2011); see also Rafael Saravia, 348 F. Supp. 2d at 1155 ("Under the Nuremburg Charter, acts constituting crimes against humanity included murder, extermination, enslavement, deportation, persecution on political, racial or religious grounds, or other inhuman acts committed against a civilian

---

[2] (a) Murder; (b) Extermination; (c) Enslavement; (d) Deportation or forcible transfer of population; (e) Imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law; (f) Torture; (g) Rape, sexual slavery, enforced prostitution, forced pregnancy, enforced sterilization, or any other form of sexual violence of comparable gravity; (h) Persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender as defined in paragraph 3, or other grounds that are universally recognized as impermissible under international law, in connection with any act referred to in this paragraph or any crime within the jurisdiction of the Court; (i) Enforced disappearance of persons; (j) The crime of apartheid; (k) Other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health.  United Nations: Rome Statute of the International Criminal Court, 37 I.L.M. 999, 1004-05, 37 I.L.M. 999 (1998), 1004-05.

population.").

Although conceding at the October 17, 2015 hearing that it is a stretch to label housing inmates in the San Joaquin Valley as an attack, Plaintiff argues that Defendants committed a widespread or systematic attack against thousands of California inmates, particularly inmates of African-American and Hispanic descent who were known to be highly susceptible and disproportionately vulnerable to the most severe form of Valley Fever.  (ECF No. 25 at ¶ 167.) Plaintiff states that these inmates were sent to areas of the San Joaquin Valley which were known to have highly toxic levels of Valley Fever spores and this was tantamount to conducting human medical experiments on inmates without their consent.  (Id.)  While nonconsensual medical experimentation on human beings is recognized as universally prohibited, the complaint does not include any allegations that nonconsensual medical experimentation is being done on inmates. Abdullahi v. Pfizer, Inc., 562 F.3d 163, 187 (2d Cir. 2009).

Plaintiff also argued at the hearing that he **thought** that German prisoners of war were moved out of the San Joaquin Valley because the German government complained about their exposure to Valley Fever.  However, the complaint is devoid of any allegations that any foreign nation complained about housing prisoners of war in the San Joaquin Valley.  In any event, even assuming that the German government complained regarding prisoners of war being housed in the San Joaquin Valley, that would not by itself establish that such conduct would constitute a violation of international norms.

To be actionable under the ATS as a crime against humanity requires "especially wicked conduct that is carried out in an extensive, organized, and deliberate way, and that is plainly unjustified.  It is this kind of hateful conduct that might make someone a common enemy of all mankind."  Mamani v. Berzain, 654 F.3d 1148, 1156 (11th Cir. 2011).

Plaintiff's allegations here, that he was housed in an area where Valley Fever spores are present, is not the kind of especially wicked conduct that would make someone a common enemy of mankind.  While the Rome Statute recognizes imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law (ECF No. 25

at ¶ 157(e)), Plaintiff is housed at Kern Valley State Prison in Delano, California.[3]  Delano is an area in the San Joaquin Valley where tens of thousands of non-incarcerated individuals reside.[4] Further, Plaintiff is Hispanic and members of Plaintiff's ethnic group, who would carry the same risk factors for developing disseminated disease, comprise 71.5 % of Delano's population.  See http://www.census.gov/quickfacts/?location=Delano%2C+CA#table/PST045214/0618394,00.

Plaintiff alleges that the decision to build prisons in the San Joaquin Valley and house the prison here was tantamount to conducting human medical experiments on inmates.  However, the 2013 census shows that over a million people reside in the San Joaquin Valley where the risk of Valley Fever is present.[5]  See United States Census Bureau, State & County QuickFacts, Kern County,       California       (2013       estimated       population       of       864,124) http://www.census.gov/quickfacts/#table/PST045214/06029,00; Fresno County California (2013 estimated population of 955,272) http://quickfacts.census.gov/qfd/states/06/06019.html  last visited Feb. 6, 2015.  Much of the litigation regarding Valley Fever originates from inmates incarcerated at Avenal State Prison which is located in Avenal, California, or Pleasant Valley State Prison which is located in Coalinga, California.  Tens of thousands of people live, work, and raise their families in the vicinity of these prisons.  See United States Census Bureau, Avenal, California http://quickfacts.census.gov/qfd/states/06/0603302.html (last visited February 2, 2015) (2013 estimated population of 14,176); City of Coalinga HomePage located at http://www.coalinga.com/?pg=1 (last visited February 2, 2015) (approximately 18,000 residents in     Coalinga);     Pleasant     Valley     State     Prison     HomePage     located     at http://www.cdcr.ca.gov/Facilities_Locator/PVSP.html.

---

[3] Kern Valley State Prison is located in Delano, California.  http://www.cdcr.ca.gov/Facilities_Locator/KVSP.html.

[4] See United States Census Bureau, State & County QuickFacts, Delano, California (2013 estimated population of 52,403) http://www.census.gov/quickfacts/?location=Delano%2C+CA#table/PST045214/0618394,00 (last visited July 10, 2015).

[5] Under the Federal Rules a court may take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Judicial notice may be taken "of court filings and other matters of public record."  Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006); Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

Assuming as true Plaintiff's allegations in the complaint, the decision to build prisons in the Central Valley and house inmates there is not a widespread or systematic attack against a civilian population that would constitute a crime against humanity. See Kadic, 70 F.3d at 238 (Since the ATS requires a plaintiff to plead a "violation of the law of nations" as the jurisdictional threshold, "it is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations." Federal subject-matter jurisdiction under the ATS does not exist unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States.)).

While it is undisputed that Valley Fever is a risk in the San Joaquin Valley, hundreds of thousands of individuals reside in these same areas and are subjected to the same environmental conditions as incarcerated individuals. Housing inmates in these same areas cannot be classified as an act directed against the inmates as a course of conduct to commit an attack. The Court finds that housing inmates in areas in which Valley Fever spores are present does not constitute an attack against a civilian population. Plaintiff fails to state a plausible claim that Defendants' conduct in housing inmates in populated areas where they are exposed to the same environmental conditions as the general population would be universally accepted as a crime against humanity.

### 3.   Cruel, Inhuman or Degrading Treatment

Similarly, Plaintiff fails to state a cognizable claim for cruel, inhuman or degrading treatment. Initially, the Court notes that whether a claim for cruel, inhuman or degrading treatment can be brought under the ATS is a matter of debate between courts. The Supreme Court has directed that we are only to recognize a new cause of action of international law norms that are "specific, universal, and obligatory[,]" Kiobel, 133 S.Ct. at 1665 (2013), and this burden is met by showing a general recognition among states that a specific practice is prohibited. Forti, 694 F.Supp.at 709. Sosa directed that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations that the historical paradigms familiar when § 1350 was enacted." Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1164, 1177 (C.D. 2005) (quoting Sosa 542 U.S. at 732.)

15

An international tort is one that satisfies the following requirements:  "(1) no state condones the act in question and there is a recognizable "universal" consensus of prohibition against it; (2) there are sufficient criteria to determine whether a given action amounts to the prohibited act and thus violates the norm; (3) the prohibition against it is nonderogable and therefore binding at all times upon all actors."  Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362, 370 (E.D. La 1997) aff'd, 197 F.3d 161 (5th Cir. 1999) (citations omitted).  "To determine whether such a norm exists, the court may consider the works of jurists, general usage and practice of nations and judicial decisions recognizing and enforcing that law."  Beanal, 969 F. Supp. at 383.

Some courts find that the tort of cruel, inhuman, and degrading treatment is not cognizable under the ATS.  Forti, 694 F.Supp. at 712 (finding no such tort as cruel, inhuman, and degrading treatment that is a universal, definable, and obligatory international norm); In re Chiquita, 792 F.Supp.2d at 1323 (finding no authority to recognize claim for cruel, inhuman, and degrading treatment).  However, many courts recognize cruel, inhuman, and degrading treatment under the ATS analyzing the plaintiff's claims to determine if the alleged conduct is sufficient to state a claim.

In Qi, the district court recognized that there are no specific standards for determining what constitutes cruel, inhuman, or degrading treatment.  349 F.Supp.2d at 1321.  The court found that the tort is recognized as being conduct that falls short of torture and need not be fully defined and universally agreed upon before it can be actionable.  Id.  The court looked to the conduct at issue to determine if it was sufficiently egregious to be found to constitute cruel, inhuman, or degrading treatment under the ATS.  Id.  The Qi court then considered whether the conduct alleged in the complaint is sufficiently severe to violate universally accepted norms prohibiting cruel, inhuman, and degrading treatment.  Id. at 1322.  The court found that the plaintiffs' claims that they were subjected to one day of incarceration and interrogation in which they were pushed, shoved, hit, and placed in a chokehold was not universally prohibited by the international community as a whole.  Id. at 1324-25.  However, one plaintiff's allegations that she was subjected to sexual abuse would be internationally accepted as cruel, inhuman, and

degrading treatment.  Id. at 1325.

In Xuncax v. Gramajo, 886 F.Supp.162 (D. Mass. 1995), the court held that cruel, inhuman and degrading treatment claims may be brought under the ATS when plaintiffs:

> witness the torture [ ] or severe mistreatment [ ]of an immediate relative; (2) watch soldiers ransack their home and threaten their family [ ](3)[are] bombed from the air [ ]; or (4) have a grenade thrown at them [ ]. I have no difficulty concluding that acts in this category constitute "cruel, inhuman or degrading treatment" in violation of international law. See generally The Greek Case, Y.B.Eur.Conv. on H.R. 186, 461-65 (1969) (describing cases where political detainees were subjected to acts of intimidation, humiliation, threats of reprisal against relatives, presence at torture of another, and interference with family life in violation of Article 3 of the European Convention on the Protection of Human Rights and Fundamental Freedom).

Bowoto v. Chevron Corp., 557 F. Supp.2d 1080, 1094 (N.D. Cal. 2008) aff'd, 621 F.3d 1116 (9th Cir. 2010) (quoting Xuncax, 886 F.Supp. at 187).  The Bowoto court found a claim for cruel, inhuman and degrading treatment where the plaintiffs were held in inhuman conditions, repeatedly beaten, and one was hung by his wrists from a ceiling fan by the military.  Bowoto, 557 F.Supp.2d at 1094.

In Wiwa v. Royal Dutch Petroleum Co., No. 96 CIV 8386 (KMW), 2002 WL 319887 (S.D. N.Y. Feb. 28, 2002), the court found a claim where the plaintiffs alleged he had been forced to flee the county under credible fear of arbitrary arrest, torture and death at the hands of the military; a plaintiff was beaten and her property was destroyed.  Id. at *8-9.  Courts do find cruel, inhuman, or degrading treatment where severe mistreatment is involved.  See Qi, 349 F.Supp.2d at 1324 (collecting cases); but cf John Roe 1 v. Bridgestone Corp., 492 F.Supp.2d 988, 1023 (S.D. In. 2007) (no claim for cruel, inhuman, or degrading treatment for exploitive labor practices); William v. AES Corp., 28 F.Supp.3d 553, 566-67 (E.D. Vir. 2014) (provision of substandard electricity is not type of malicious, intentional conduct actionable under recognized norms of international law).

Plaintiff argues that Defendants have violated his right to health as defined in the International Convention on Economic, Social and Cultural Rights and that it is clear that exposing inmates who are at a high risk of developing disseminated disease to areas in which Valley Fever spores are endemic is clearly a violation of international norms.  However, as

demonstrated by the decisions within this district addressing the Eighth Amendment claims, it is not clear that the allegations in this action can state a claim for deliberate indifference, much less that they would be internationally accepted as cruel, inhuman, or degrading treatment.  Plaintiff has made no allegations that he has been denied adequate medical care in prison once he was diagnosed with Valley Fever.  The Court finds that housing Plaintiff in the San Joaquin Valley is not a violation of the International Convention on Economic, Social and Cultural Rights.

Here, the conduct complained of, housing Plaintiff in an area where he could contract Valley Fever, does not violate a norm of customary international law to which states universally subscribe.  The Court does not find that there is a binding obligation under international law to provide prisoners with conditions safer than those of the general population.  Plaintiff's claims do not rise to the magnitude of those actions found to be cruel, inhuman, and degrading.  Plaintiff has failed to allege conduct that is severe enough to state a claim of cruel, inhuman, and degrading treatment under the ATS.

      4.    Torture

Among the rights that are universally proclaimed by all nations is a fundamental right of all individuals to be free from torture.  Filartiga, 630 F.2d at 890; see also Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 717 (9th Cir. 1992) (the Ninth Circuit held that "the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law, a norm of jus cogens").  The United Nations has defined torture as "any act by which severe pain and suffering, whether physical or mental, is intentionally inflicted by or at the instigation of a public official on a person for such purposes as . . . intimidating him or other persons."[6]  Filartiga, 630 F.2d at 883.  Torture constitutes an aggravated and deliberate

---

[6] "[T]orture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted by or at the instigation of a public official on a person for such purposes as obtaining from him or a third person information or confession, punishing him for an act he has committed or is suspected of having committed, or intimidating him or other persons. It does not include pain or suffering arising only from, inherent or incidental to lawful sanctions to the extent consistent with the Standard Minimum Rules for the Treatment of Prisoners." Filartiga, 630 F.2d at 883 n.11 (quoting Declaration on the Protection of All Persons from Being Subjected to Torture, General Assembly Resolution 3452, 30 U.N. GAOR Supp. (No. 34) 91, U.N.Doc. A/1034 (1975).  Torture constitutes an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment.  The definition of torture under the Torture Victim Protection Act mirrors that of the United Nations Convention against Torture.  Qi, 349 F.Supp.2d at 1312.

1  form of cruel, inhuman or degrading treatment or punishment.   <u>Id.</u> at 883 n.11 (quoting

2  Declaration on the Protection of All Persons from Being Subjected to Torture, General Assembly

3  Resolution 3452, 30 U.N. GAOR Supp. (No. 34) 91, U.N.Doc. A/1034 (1975)).

4         "[T]orture is a label that is 'usually reserved for extreme, deliberate and unusually cruel

5  practices, for example, sustained systematic beating, application of electric currents to sensitive

6  parts of the body, and tying up or hanging in positions that cause extreme pain.' "   <u>Simpson v.</u>

7  <u>Socialist People's Libyan Arab Jamahiriya</u>, 326 F.3d 230, 234 (D.C. Cir. 2003) (quoting <u>Price v.</u>

8  <u>Socialist People's Libyan Arab Jamahiriya</u>, 294 F.3d 82, 92-93 (D.C. Cir. 2002)).   Since the

9  Court finds that Plaintiff's claims do not rise to the magnitude of those found to be cruel,

10  inhuman and degrading, they clearly do not meet the definition of torture.   <u>See</u> <u>Qi</u>, 349

11  F.Supp.2d at 1314-18 (examining casing rising to the level of torture).   Housing Plaintiff at

12  KVSP was not torture in violation of international law.

13         **B.       Cruel and Unusual Punishment**

14         Defendants move to dismiss the complaint on the grounds that the allegations are

15  insufficient to show that any defendant committed an act or omission that violated Plaintiff's

16  rights and further that Defendants are entitled to qualified immunity.   Since the issue of qualified

17  immunity for the Eighth Amendment claims is dispositive in this instance, the Court shall not

18  address Defendants' argument that the allegations in the complaint are insufficient to state a

19  claim.

20         1.    <u>Qualified Immunity Legal Standard</u>

21         The doctrine of qualified immunity protects government officials from civil liability

22  where "their conduct does not violate clearly established statutory or constitutional rights of

23  which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)

24  (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).   To determine if an official is entitled

25  to qualified immunity the court uses a two part inquiry.   <u>Saucier v. Katz</u>, 533 U.S. 194, 200

26  (2001).   The court determines if the facts as alleged state a violation of a constitutional right and

27  if the right is clearly established so that a reasonable official would have known that his conduct

28  was unlawful. <u>Saucier</u>, 533 U.S. at 200.

1    The district court is "permitted to exercise [its] sound discretion in deciding which of the

2    two prongs of the qualified immunity analysis should be addressed first in light of the

3    circumstances in the particular case at hand." Pearson, 555 U.S. at 236.  The inquiry as to

4    whether the right was clearly established is "solely a question of law for the judge." Dunn v.

5    Castro, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting Tortu v. Las Vegas Metro. Police Dep't.

6    556 F.3d 1075, 1085 (9th Cir. 2009)).  In deciding whether officials are entitled to qualified

7    immunity, the court is to view the evidence in the light most favorable to the plaintiff and resolve

8    all material disputes in the favor of the plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th

9    Cir. 2003).

10    It is the plaintiff that bears the burden of demonstrating that the right was clearly

11    established at the time that the defendants acted.  May v. Baldwin, 109 F.3d 557, 561 (9th Cir.

12    1997).  Defendants cannot be held liable for a violation of a right that is not clearly established at

13    the time the violation occurred.  Brown v. Oregon Dep't of Corrections, 751 F.3d 983, 990 (9th

14    Cir. 2014).  A constitutional right is clearly established when its contours are "sufficiently clear

15    [so] that a reasonable official would understand that what he is doing violates that right." Hope

16    v. Pelzer, 536 U.S. 730, 739 (2002).  In light of the preexisting law the lawfulness of the officials

17    act must be apparent.  Hope, 536 U.S. at 739.  The court is to look to the state of the law at the

18    time the defendants acted to see if it gave fair warning that the alleged conduct was

19    unconstitutional.  Id. at 741.  The Supreme Court has emphasized that it is often difficult for an

20    official to determine how relevant legal doctrine will apply to the specific situation that is faced

21    and that is why qualified immunity protects "all but the plainly incompetent or those who

22    knowingly violate the law[.]"  Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir.

23    2002).

24    The Supreme Court has repeated reminded us that we are not to define clearly established at a

25    high level of generality.  Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2084 (2011).  The qualified

26    immunity inquiry is to be taken in light of the specific context of the case, not as a broad general

27    proposition, Brosseau v. Haugen, 543 U.S. 194, 198 (2004), but "must be defined at the

28    appropriate level of specificity[,]" Wilson v. Layne, 526 U.S. 603, 615 (1999).

2.      Defendants are Entitled to Qualified Immunity as it is Not Clearly Established that Housing Plaintiff at KVSP Would Violate his Eighth Amendment Rights

Qualified immunity shields an official from personal liability where he reasonably believes that his conduct complies with the law. Pearson, 555 U.S. at 244.  " 'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " Stanton v. Sims, 134 S.Ct. 3, 5 (2013) (citations omitted).  In determining whether the defendant is entitled to qualified immunity, the court is to determine if "a reasonable officer would have had fair notice that [the action] was unlawful, and that any mistake to the contrary would have been unreasonable." Chappell v. Mandeville, 706 F.3d 1052, 1056-57 (9th Cir. 2013) (quoting Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1060–61 (9th Cir. 2003)).

In determining if the law is clearly established we first look to binding precedent. Chappell, 706 F.3d at 1056.  If there is none on point, we look to other decisional law, including the law of other circuits and district courts. Id. at 1056; Osolinski v. Kane, 92 F.3d 934, 936 (9th Cir. 1996).  The Court finds no Supreme Court or published Ninth Circuit case that has addressed whether an inmate's environmental exposure to Valley Fever or any other environmental organism would be a violation of the Eighth Amendment.

In the related case of Jackson, this Court issued findings and recommendations finding that Defendants are entitled to qualified immunity for housing inmates in areas in which Valley Fever spores are prevalent.  Plaintiff's allegations here are substantially identical to the complaint in Jackson.  Plaintiff is alleging that Defendants knew that placing him at "KVSP where the prevalence of spore-laden soils was hazardous posed an unacceptable risk of irreparable harm to inmates." (ECF No. 1 at ¶ 36.)  It had previously been reported that 70 percent of all reported Valley Fever cases arose in the San Joaquin Valley.  (Id. at ¶ 37.) Defendants were aware "that exposure to spore-infested soils at the eight California hyper-endemic prisons posed an unacceptable risk of life-long Valley Fever infection, illness, and

1  death, to inmates located at the hyperendemic [sic] prisons, including Plaintiff."  (Id. at ¶ 73.)

2  Therefore, the question to be addressed here is the same as in Jackson.  In the corrected

3  memorandum decision and order, Judge O'Neill found that under any definition of the

4  constitutional right in this instance, Defendants are entitled to qualified immunity.  Jackson v.

5  Brown, No. 1:13-cv-01055-LJO-SAB, __ F.Supp.3d __, 2015 WL 5732826, at *1 (E.D. Cal.

6  Sept. 17, 2015).

7        This Court has found, and Judge O'Neill has held that the constitutional right at issue here

8  was not clearly established.  Jackson, 2015 WL 5732826 at 8; see also Smith v. Schwarzenegger, No.

9  1:14-cv-0060-LJO-SAB, __ F.Supp.3d. __, 2015 WL 5915353 (E.D. Cal. October 7, 2015) (finding

10  defendants entitled to qualified immunity on similar Eighth Amendment claims); Nawabi v. Cates,

11  No. 1:13-cv-00272-LJO-SAB, 2015 WL 5915269 (E.D. Cal. October 7, 2015) (same); Gregge v.

12  California Department of Corrections, No. 1:15-cv-00176-LJO-SAB (E.D. Cal. Oct. 7, 2015) (same);

13  Hines v. Youssef, No. 1:13-cv-0357-AWI-JLT, 2015 WL 2385095, at *10 (E.D. Cal. May 19, 2015)

14  (finding defendants entitled to qualified immunity because the categories of race and other forms of

15  respiratory exclusion criteria were not clearly established).  [7]  In Jackson the court found that "the

16  circumstances in which an inmate's exposure to cocci while incarcerated may support an Eighth

17  Amendment claim are not clear."  Id. at *2.  The court found no controlling authority to place

18  Defendants on notice that housing inmates at high risk of developing disseminated disease in areas in

19  which Valley Fever is endemic would be unlawful. Id. at *4-5.  "Critically, judges have disagreed as

20  to whether allegations that an inmate's ethnicity increases the risk of contracting Valley Fever and

21  developing disseminating Valley Fever states an Eighth Amendment claim.  Judges also have

22  disagreed as to whether an inmate's allegations that medical conditions increase the risk of

23  contracting Valley Fever and developing disseminated Valley Fever states an Eighth Amendment

24  claim." Id. at *5.

25        Even where the actions involved allegations materially identical to those raised in this action,

26

---

27  [7] On May 19, 2015, District Judge Anthony W. Ishii also found that Defendants were entitled to qualified immunity from suit in an action in which an inmate challenged his confinement at Wasco State Prison due to the high probability of exposure to Valley Fever.  Hines v. Youssef, No. 1:13-cv-0357-AWI-JLT, 2015 WL 2385095 (E.D. Cal. May 19, 2015).

28

courts have granted summary judgment for Defendants reasoning that "[b]y placing a prison and other extensive facilities in the PVSP location, attended by prison employees, officials, and support personnel, as well as inmates, society plainly tolerates the health risks of that location." Moreno v. Yates, No. 1:07-cv-01404-DGC, 2010 WL 1223131, *2 (E.D. Cal March 24, 2010).

A review of the case law within this district shows that there is an "obvious, legitimate, and reasonable disagreement among judges" regarding what would be required to state a claim under the circumstances alleged in the complaint. Jackson, 2015 WL 57532826, at *8. The Jackson court found that "[e]ven assuming Defendants' conduct was unlawful . . . the disagreement among judges with regard to analogous Valley Fever cases brought by inmates in San Joaquin Valley prisons establishes that the right at issue here was not sufficiently clear such that Defendants had 'fair warning' that their conduct was unlawful." Id. (quoting Flores v. Morgan Hill Unified School Dist., 324 F.3d 1130, 1137 (9th Cir.2003)). Due to this, the court could "find that Defendants' conduct was obviously illegal (much less overwhelmingly so) because "[t]he state of the law was at best undeveloped." Jackson, 2015 WL 57532826 at *8 (quoting Wilson, 526 U.S. at 617). While there has been substantial litigation of the issue within this District, no consensus has emerged. Jackson at *8. "Although that litigation has shed some light on the issue, no authority has fleshed out at what point the risk of harm from Valley Fever becomes sufficiently substantial for Eighth Amendment purposes." Id. (internal punctuation and citations omitted). The court found that the defendants were entitled to qualified immunity. Id.

Accordingly, the Court finds that Defendants are entitled to qualified immunity for housing Plaintiff at KVSP and recommends granting Defendants' motion to dismiss the Eighth Amendment claims on this ground.

### C.   Injunctive Relief

Plaintiff is seeking "an order allowing Plaintiff to return to the United States and the concurrent establishment of a comprehensive court-supervised program of medical treatment for Plaintiff." (ECF No. at 25 at 45.) Defendants argue that Plaintiff's claims for injunctive relief are barred by the Eleventh Amendment as he is effectively seeking monetary damages and Defendants do not have the ability to alter Plaintiff's immigration status. Plaintiff does not oppose Defendants'

1  motion on the issue of injunctive relief.

2       "A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v.

3  Natural Resources Defense Council, Inc., 129 S. Ct. 365, 376 (2008) (citation omitted).  "A plaintiff

4  seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is

5  likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips

6  in his favor, and that an injunction is in the public interest."  Marlyn Nutraceuticals, Inc. v. Mucos

7  Pharma GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009) (quoting Winter, 129 S. Ct. at 374).  An

8  injunction may only be awarded upon a clear showing that the plaintiff is entitled to relief.  Winter,

9  129 S. Ct. at 376 (citation omitted).

10       For each form of relief sought in federal court, Plaintiff must establish standing.  Mayfield v.

11  United States, 599 F.3d 964, 969 (9th Cir. 2010), cert.denied, 131 S. Ct. 503 (2010).  This requires

12  Plaintiff to "show that he is under threat of suffering 'injury in fact' that is concrete and

13  particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be

14  fairly traceable to challenged conduct of the defendant; and it must be likely that a favorable judicial

15  decision will prevent or redress the injury."  Summers v. Earth Island Institute, 129 S. Ct. 1142, 1149

16  (2009) (citation omitted); Mayfield, 599 F.3d at 969 (citation omitted).

17       1.    Court Supervised Program of Medical Treatment

18       Injunctive relief that is intended to address a present violation of federal law is not barred

19  by the Eleventh Amendment.  Papasan v. Allain, 478 U.S. 265, 278 (1986).  However, relief that

20  is intended to compensate a victim for a past violation of federal law is barred.  Papasan, 478

21  U.S. at 278.  "[W]hen a plaintiff sues a state official alleging a violation of federal law, the

22  federal court may award an injunction that governs the official's future conduct, but not one that

23  awards retroactive monetary relief."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89,

24  102-03 (1984); see also Peralta, 744 F.3d at 1084 (A state can be compelled to correct

25  constitutional violations, "but such a lawsuit could provide no redress for past constitutional

26  violations because the state is protected by sovereign immunity, 'a fundamental aspect of the

27  sovereignty which the States enjoyed before the ratification of the Constitution, and which they

28  retain today.' " (citation omitted)).  Accordingly, retroactive relief is barred by the Eleventh

1    Amendment.  <u>Pennhurst State Sch. & Hosp.</u>, 465 U.S. at 103.

2          In this instance, Plaintiff is not seeking prospective relief.  The remedy Plaintiff is

3    seeking would effectively be an award of damages for a past violation of federal law which is

4    barred by the Eleventh Amendment.  <u>Green v. Mansour</u>, 474 U.S. 64, 70 (1985.)  Since Plaintiff

5    is not being subjected to a continuing violation of federal law, he cannot receive injunctive relief

6    in this action.  <u>Green</u>, 474 U.S. at 71.

7              2.      <u>Court Order for Plaintiff to Return to the United States</u>

8          The relief requested by Plaintiff is not related to the underlying claims that Defendants

9    exposed him to the risk of Valley Fever by housing him at KVSP.  Since the relief sought would

10   not remedy the violation of the Federal right at issue here, the Court cannot grant the requested

11   relief.  Defendants' motion to dismiss Plaintiff's claims for injunctive relief should be granted.

12

13         **D.      Leave to Amend**

14         Plaintiff seeks leave to amend the first amended complaint to add an additional defendant.

15   Under Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend the party's

16   pleading once as a matter of course at any time before a responsive pleading is served.

17   Otherwise, a party may amend only by leave of the court or by written consent of the adverse

18   party, and leave shall be freely given when justice so requires.  Fed. R. Civ. P. 15(a).  Rule 15(a)

19   is very liberal and leave to amend 'shall be freely given when justice so requires.'"  <u>Amerisource</u>

20   <u>Bergen Corp. v. Dialysis West, Inc.</u>, 465 F.3d 946, 951 (9th Cir. 2006) (quoting Fed. R. Civ. P.

21   15(a)).  However, courts "need not grant leave to amend where the amendment:  (1) prejudices

22   the opposing party; (2) is sought in bad faith; (3) produces an undue delay in the litigation; or (4)

23   is futile."  <u>Id</u>.

24         In this instance, the Court finds that amendment of the complaint would be futile as

25   Defendants are entitled to qualified immunity on the Eighth Amendment claims and the

26   allegations do not rise to the level of an ATS claim as discussed herein.  Accordingly, Plaintiff's

27   motion to amend the complaint to add an additional defendant should be denied due to futility of

28   amendment.

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1.      Defendants' motion to dismiss the first amended complaint be granted; and

2.      Plaintiff's request to amend the complaint be denied as futile.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 19, 2015**

UNITED STATES MAGISTRATE JUDGE